Kanawha County Sheriff's Office
Detective Lieutenant A.C. Pile
Criminal Investigations Section
301 Virginia Street, East
Charleston, West Virginia 25301

# Report of Investigation

March 10, 2023

Internal Affairs Investigation

**Officer/Employee:**   Cabell County Deputy Jeffery S. Racer

**Nature of Complaint:**   Deputy Jeffery Racer was involved in a motor vehicle crash in which a pedestrian was struck and killed. At the time of the crash, he was operating his department-issued vehicle and was off-duty. Also, there was a civilian passenger in the vehicle. There are allegations that Dep. Racer may have been speeding.

**Date of Complaint:**   January 6, 2023

**Date of Incident:**   December 30, 2022

**Investigation Authorized By:**   Chief Deputy J. Crawford

### Background:

On January 6, 2023, I was directed to conduct an Internal Affairs Investigation into the actions of Cabell County Deputy Sheriff Jeffery Racer regarding a fatal crash that occurred on December 30, 2022, in Huntington, West Virginia.

**Action Taken:**

On January 4, 2023, I was verbally advised by Sheriff Michael Rutherford that Cabell County Sheriff, C.N Zerkle, Jr., had requested the assistance of the West Virginia Sheriff's Association to secure an independent sheriff's office in West Virginia to conduct an internal investigation. The investigation was regarding an incident involving a Cabell County Sheriff's deputy that occurred on December 30, 2022. Sheriff Rutherford further explained that I am being assigned to conduct said investigation. Sheriff Rutherford provided me with a letter signed by Rodney Miller, Executive Director, of the West Virginia Sheriff's Association.

On January 6, 2023, I was provided a formal Memorandum assigning me to conduct the Internal Affairs Investigation into the actions of Cabell County Deputy Sheriff Jeffery Racer as they relate to a fatal crash. The purpose of the investigation is to determine what, if any, policy violations occurred pursuant to Cabell County Sheriff's Office rules and regulations.

On January 9, 2023, I spoke with Chief Adams, Cabell County Sheriff's Office, regarding my need for his department policy and all reports, photographs, statements, video, etc., to conduct the investigation. He explained that the West Virginia State Police are heading the crash investigation and Huntington Police Department had body-worn camera video.

On January 17, 2023, Sergeant Johnston, Cabell County Sheriff's Office, brought to me a CD containing two files labeled: Policy Manual Administrative Rules and UPDATED Policy Manual.

On January 18, 2023, I spoke with Cabell County Prosecutor, Mark Sorsaia, who stated I could obtain any reports needed to conduct the internal investigation.

On January 31, 2023, I met with Trooper Susan Clagg, West Virginia State Police Troop 5, in Huntington. Trooper Clagg provided me with a thumb drive containing Huntington Police Department body-worn camera footage pertaining to the crash.

On February 1, 2023, Trooper M.J. Adkins, brought me the following:

1. WVSP22-5528, State of West Virginia Uniform Traffic Crash Report, completed by Trooper M.J. Adkins (10 pages) (Trp. Adkins noted this report wasn't the final report and it needs measurements within the diagram)
2. CD containing scene photographs labeled "Hudson Scene Photos 22-213553"
3. West Virginia State Police, REPORT OF CRIMINAL INVESTIGATION, DETACHMENT FILE NUMBER 22-213553 (7 pages)
4. Huntington Police Department Statement Form of ▓▓▓▓▓▓▓▓▓▓▓ (Proper spelling is ▓▓▓▓▓▓▓▓▓▓▓)
5. Huntington Police Department Statement Form of ▓▓▓▓▓▓▓
6. Huntington Police Department Statement Form of Joan Hatfield
7. Huntington Police Department Statement Form of Bethanie Anderson
8. Miscellaneous documents from Huntington Police Department (12 pages)
9. Handwritten statement of Jeffery Racer

**Action Taken (Cont.'):**

10. West Virginia State Police Huntington Detachment Statement Form of Hannah Giammarino
11. CCERC 911 CAD CALL INFORMATION (5 pages)
12. West Virginia Governor's Committee on Crime, Delinquency and Correction Vehicle Search Consent Form, signed by Sheriff C.N. Zerkle, Jr.
13. Office of Chief Medical Examiner Child Death Notification to CPS and WV State Police CACU (and fax cover page)
14. BOSCH Crash Data Retrieval Report pertaining to VIN 1FM5K8AR9HGD58398 (11 pages)

While reviewing the Huntington Police Department body-worn camera footage, I observed two WVSP officers speaking with Jeffery Racer. It appeared as if those troopers had body-worn cameras on their uniforms. On February 6, 2023, I contacted Trooper Clagg regarding identifying those troopers and she said one of them was a new "boot" from Wayne County. She added that she would have Sergeant Wellman call me.

Sergeant Wellman, West Virginia State Police, contacted me on February 6th, and advised the officers on scene were Troopers M.J. Adkins and Jonathon Johnson. He provided me with Trooper Johnson's cell phone number.

On February 8, 2023, I spoke with Trooper Jonathon Johnson, West Virginia State Police, Wayne Detachment, on the telephone. He explained that he was present during the incident in question, but he was not equipped with a body-worn camera. Trooper Johnson further explained he was assigned to Trooper M. J. Adkins for his "rotation period." I asked Trooper Johnson if he recalled speaking to Jeffery Racer at the scene, to which he said he did. I asked if he would tell me what he remembered being said during the encounter with Deputy Racer. He recalled that Deputy Racer said he was going through the light, he swerved to miss her, and he hit her. I asked if he remembered Deputy Racer lowering his voice and saying something, to which he said he did not. I specifically asked if Deputy Racer made any other comments and Trooper Johnson offered that Deputy Racer said he might have been going too fast. Also, Trooper Johnson was "pretty certain," Deputy Racer said he had a green light.

Later, I inquired of Trooper M.J. Adkins about a body-worn camera. He explained he was wearing a body-worn camera the night of the crash; however, it was not recording.

On February 10, 2023, I contacted Trooper Adkins about the crash reconstruction report being ready/complete. He explained that it wouldn't be complete until the autopsy results were received.

On February 13, 2023, I spoke with Trooper Robert Marsh via telephone. He confirmed that he is completing the crash reconstruction report. Trooper Marsh advised he had determined Dep. Racer was traveling at a median speed of 49 mph. He stated the posted speed limit at the crash scene is 35 mph. Furthermore, Trooper Marsh said when configuring a vehicle's speed, there is a +/- 10 mph allowance.

**Action Taken (Cont.'):**

On February 28, 2023, I spoke with Deputy Racer on the telephone, and we agreed on Monday, March 6, 2023, at 9:30 for him to meet me at Kanawha County Sheriff's Office Headquarters. The purpose of the meeting is to interview Deputy Racer as part of this internal investigation. I advised him to let me know if he needed to change the meeting date and time for any reason.

**Interview of Deputy Jeffery Racer**

On March 6, 2023, I met with and interviewed Deputy Jeffery Racer at the Kanawha County Sheriff's Office. I read Dep. Racer the Garrity Warning Form, which he signed and indicated he understood it.

I explained to Dep. Racer that it was requested by the Sheriff of Cabell County that an internal investigation be conducted by a member of the Kanawha County Sheriff's Office. The investigation focused on his actions surrounding a pedestrian being struck and killed on December 30, 2022.

Dep. Racer acknowledged that he was off duty during the motor vehicle crash and was operating his Cabell County Sheriff's Office cruiser. The cruiser, at the time, was a 2018 Ford Explorer marked as #1803. He stated this was a "spare" vehicle because his assigned vehicle was receiving maintenance. When asked, Dep. Racer affirmed that there were no defects with the spare vehicle to his knowledge.

Furthermore, Dep. Racer explained he was operating the department vehicle while off duty, because he was going to spend the night at Hannah Giammarino's residence in Proctorville, OH, then start his shift the next morning at 6am. He stated he and his wife were separated at the time and he had been staying with his nephew in Culloden. He stated he didn't ask for permission from a supervisor to operate his department vehicle while off duty. Furthermore, Dep. Racer affirmed that Hannah Giammarino was a front seat passenger in the department vehicle at the time of the crash. Dep. Racer acknowledged that he didn't ask for permission from a supervisor to have Ms. Giammarino in the vehicle.

Deputy Racer provided the following events leading up to the crash on December 30th. He worked his CCSO shift, which ended at 4pm, then went to his nephew's house in Culloden where he parked his cruiser. He attended his son's wrestling match in Greenup, KY (drove personal vehicle). Then, he picked up Hannah Giammarino at her residence in Proctorville and she agreed to ride with him to obtain his personal vehicle. The plan was for Mrs. Giammarino to drive his personal vehicle back to her residence and he would drive his cruiser to her house, where he intended to spend the night.

Next, they travel in the cruiser to Culloden where Ms. Giammarino obtains Dep. Racer's personal vehicle. They drove off separately, but Dep. Racer contacted her by cell phone and asked if she wanted to stop and eat dinner, to which she agreed. They met at the Tequila Grill in Huntington where he believed they remained for approximately two hours. While there,

**Action Taken (Cont.'):**

Dep. Racer stated he consumed a Michelada (non-alcoholic bloody Mary mix with beer), and Ms. Giammarino might have consumed a margarita.

Then, he drove his cruiser, and she drove his personal vehicle, to a townhouse he was renting in Huntington where he decided to park his personal vehicle. After this, Dep. Racer and Ms. Giammarino got into his cruiser with the intent of going to her residence. Dep. Racer stated he noticed his fuel gauge showed "16 miles to empty." He explained he has a department issued fuel card for TTA and started in that direction to get fuel.

Dep. Racer stated he had crossed the 31st Street bridge and saw he had a green light, so he proceeded through the intersection. Later in the interview, Dep. Racer stated he was "100%" certain he had a green light to proceed. He saw something out of the corner of his eye (to his left), and he saw a pedestrian in the roadway to his left. At this same time, he applied his brakes and simultaneously struck a different pedestrian, whom he didn't initially see. He stated he applied his brakes at about the same time of impact and tried to veer right. I asked if he felt like he had any recourse or any way to avoid striking the pedestrian, and he said he did not.

Dep. Racer further explained after the impact, he put his cruiser in park and ran over to the injured person. He said he yelled to a female on her porch to call 911. Also, he observed three to four young individuals screaming, whom he believed had been in the company of the injured person. He approached them and asked what happened. He recalled a female stating, "She just ran out into the middle of the road." Then, he ran back toward his cruiser and initiated his blue lights. He observed the woman on the phone with 911 and she was having trouble speaking, so he stated he took her phone, identified himself, and requested EMS and HPD, because he had struck a pedestrian in his cruiser.

When asked, Dep. Racer stated, "I have no idea how fast I was going." He acknowledged that the posted speed limit was 35 mph. I explained that the crash reconstructionist had configured 49 mph as the median speed he was traveling and asked if that could have been his speed. Again, he said he didn't know what his speed was.

Dep. Racer denied using his cell phone or participating in any other activity that would have distracted him as a driver.

I showed Dep. Racer Huntington Body-Worn Camera Video labeled "CCSD 23_001." The video is captured by Patrolman Bradley's body-worn camera. Two WVSP Troopers come into view, whom Dep. Racer identified as Trooper Johnson and Trooper Adkins. Patrolman Bradley asked him if he was all right and Dep. Racer replied, "No man, I kil- I fucking killed her accidentally. I was headed to go get-I was headed to go get gas and, I mean, I was headed to go get gas I really was. I was, I was (unintelligible)." At this point, what Dep. Racer says on the video is unintelligible and he appears to be speaking low and directly to Trooper Johnson. A few seconds later Dep. Racer can be heard speaking to Trooper Adkins. I asked Dep. Racer if he recalled telling Patrolman Bradley or Trooper Adkins, he was going too fast. Dep. Racer stated he didn't recall.

**Action Taken (Cont.'):**

Deputy Racer stated he didn't know what he said in the video.

I paused the recording and stepped out to consult with Detective/Lieutenant Sean Snuffer. I resumed the interview with Deputy Racer. I asked if he was taking any prescription medication at the time of the crash. He said he was prescribed Paxil; however, he hadn't been taking it for a couple of weeks at the time of the crash. He denied using any illicit drugs at the time of the crash or prior. The interview was concluded with Dep. Racer and agreed to speak with me again if any further questions arose.

**Summary:**

During the interview with Deputy Racer, he admitted to having an unauthorized person in his department-issued vehicle. Deputy Racer also admitted to drinking an alcoholic beverage and then operating his department-issued vehicle. Law Enforcement Officers are to be held to a higher moral standard than the public. Therefore, Deputy Racer's actions of drinking one alcoholic beverage and then operating his department-issued police vehicle afterward show he used poor judgment.

The West Virginia State Police investigation indicates that Deputy Racer was driving above the posted speed limit. Deputy Racer was unsure of what his actual speed was, and no data was retrieved from the event data recorder of the police vehicle he was operating at the time of the crash.

At the conclusion of this internal investigation, Deputy Jeffery Racer is believed to have violated the following sections of the Cabell County Sheriff's Office Administrative Rules and Regulations:

1. Based on the crash investigation conducted by the West Virginia State Police, it is determined that Deputy Racer was traveling at a median speed of 49 miles per hour in a 35-mile-per-hour speed zone when the crash occurred. Speeding is a misdemeanor crime in the State of West Virginia under West Virginia statute 17C-6-1. This is a violation of Cabell County Sheriff's Office Rules of Conduct and Behavior, 17-10, Subsection IV, Number 1. **Obedience to Laws**

2. Based on the interview conducted with Deputy Racer, he does not know what speed he was traveling when the crash occurred. The investigation conducted by the West Virginia State Police determined that Deputy Racer was traveling in his department-issued vehicle at a median speed of 49 miles per hour in a 35-mile-per-hour zone. This indicates that Deputy Racer was operating his vehicle in an irresponsible manner. This is a violation of Cabell County Sheriff's Office Rules of Conduct and Behavior, 17-10, Subsection IV, Number 28. **Department Vehicles.**

3. Based on the interview conducted with Deputy Racer, he admits to drinking an alcoholic beverage at a restaurant. Deputy Racer admits to leaving the restaurant and driving his

department-issued vehicle after consuming an alcoholic beverage. This action conducted in the public shows Deputy Racer did not show good moral judgment by drinking an alcoholic beverage and then operating a Cabell County Sheriff's Office vehicle. This is a violation of Cabell County Sheriff's Office Rules of Conduct and Behavior, 17-10, Subsection IV, Number 7. **Moral Turpitude and Good Character**

4. Based on the interview conducted with Deputy Racer, he admits that he was utilizing his department-issued vehicle for personal business and for the transportation of an unauthorized person. This is a violation of Cabell County Sheriff's Office Rules of Conduct and Behavior, 17-10, Subsection IV, Number 34. **General Duty Requirement, Letter "S"**

This internal affairs investigation will be submitted to Sheriff Zerkle, Cabell County Sheriff's Office. A copy will be retained at the Kanawha County Sheriff's Office.